COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone 602•252•8400

Daniel G. Dowd (012115)
Email: ddowd@CDQLaw.com
Stacey F. Gottlieb (015084)
Email: sgottlieb@CDQLaw.com
Lauren M. LaPrade (029860)
Email: llaprade@CDQLaw.com
Kaysey L. Fung (032585)
Email: kfung@CDQLaw.com

**CENTRAL ARIZONA WATER CONSERVATION DISTRICT**
Jay M. Johnson (015122)
23636 North 7th Street
Phoenix, Arizona 85024
Telephone: (623) 869-2333
Email: jjohnson@cap-az.com

Attorneys for Defendant Central Arizona Water Conservation District

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| The Hopi Tribe; The United Mine Workers of America; and Peabody Western Coal Company, | Case No: 2:18-cv-01337-SPL |
| Plaintiffs, | **MOTION TO DISMISS** |
| vs. | (Assigned to the Honorable Steven P. Logan) |
| Central Arizona Water Conservation District, | |
| Defendant. | **(Oral Argument Requested)** |

This case is about the retirement of the Navajo Generating Station ("NGS"), the decision of its owners to shut down this coal fired power plant effective December 2019, and Plaintiffs' fundamentally flawed, but understandable, last-ditch effort to try to keep the plant open. Plaintiff Peabody Western Coal Company ("Peabody") owns the Kayenta Mine (the "Mine") which supplies coal to NGS and is located on land owned by Plaintiff, the Hopi Tribe, and non-party the Navajo Nation. The Mine employs workers who are members of Plaintiff United Mine Workers of America ("UMWA"). Plaintiffs all benefit financially (and mightily as alleged in the Complaint) from the operation of the Mine and, consequently, NGS. They desperately want NGS to remain open and operating. But Plaintiffs are not the owners of NGS and have no right—constitutional, statutory or common law—to control its destiny; just as the sole defendant they have sued, the Central Arizona Water Conservation District ("CAWCD") does not.

CAWCD is a multi-county water conservation district created by and to serve Maricopa, Pima and Pinal counties. Pursuant to contracts with the United States, CAWCD operates and maintains the Central Arizona Project ("CAP"), which transports Colorado River water to millions of users in Central and Southern Arizona. CAWCD does not own any interest in NGS. CAWCD purchases NGS power, but NGS is not its only source of power. Plaintiffs ask this Court to order CAWCD to buy all of its power requirements from NGS for as long as NGS remains "open." It is Plaintiffs' *hope* that unidentified *potential* buyers *might* purchase and continue operating NGS *if* this Court were to issue mandatory injunctive relief, even though Plaintiffs concede CAWCD's total power needs would consume under 24.3% of the plant's output. Plaintiffs believe this outcome is justified because it yields the most economic benefits to them—at the expense of CAWCD and its water users. But, CAWCD has no obligation to Plaintiffs and no obligation to purchase all of CAP's power requirements from NGS. Rather, CAWCD *is absolutely* obligated to procure reliable power to operate CAP and deliver water at the lowest reasonable cost to its customers.

Plaintiffs' contention that *potential* buyers *might* be dissuaded from purchasing NGS *if* CAWCD solicits other power sources for its post-2019 operations is too speculative, remote

1

and uncertain to vest this Court with subject matter jurisdiction.  Moreover, the United States and others are necessary, indispensable parties that cannot be joined because of their sovereign immunity.  Finally, Plaintiffs' Complaint [Doc. 1] lacks a cognizable legal theory, and Plaintiffs have failed to plead facts sufficient to state a plausible claim for relief.  There is <u>no</u> private right of action under Section 303 of the Colorado River Basin Project Act, and, even if there was, Section 303 does <u>not</u> obligate CAWCD to purchase its pumping power from NGS as long as NGS remains "open" (whatever that means).

Plaintiffs' Complaint fails for multiple, independent reasons and must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(b)(7).

## I.    SALIENT FACTUAL BACKGROUND.[1]

In 1968, Congress approved the construction of CAP pursuant to the Colorado River Basin Project Act ("CRBPA"), Pub. L. 90-537, 90th Cong. S. 104 (Sept. 30, 1968), partially codified at 43 U.S.C. §§ 1501 *et seq.* (as amended).  In 1971, the Arizona Legislature authorized the creation of CAWCD to repay Arizona's share of CAP construction costs, to deliver water, and to operate and maintain the CAP.  *See* A.R.S.§ 48-3703.  [*See also* Compl. ¶¶ 9, 21, 23.] The CAP consists of a 335-mile canal, 14 pumping plants, a power-generating pumping plant, a storage reservoir, tunnels and siphons for pumping and delivering Colorado River water to Arizona users who rely upon it for domestic, municipal, industrial and agricultural purposes. [*See* Compl. ¶¶ 13, 24.]  *See also CAWCD v. U.S.*, 32 F. Supp. 2d 1117, 1121-23 (D. Ariz. 1998).

As CAP requires a tremendous amount of power, Section 303 of the CRBPA gave the Secretary of the Department of the Interior (the "Secretary") one year to recommend "the most feasible plan" for any combination of hydro-electric generating and transmission facilities, the purchase of electrical energy or the purchase of electrical plant capacity. [Compl. ¶ 15.]  If included as a part of the recommended plan, Congress also authorized the Secretary to enter into agreements with non-federal entities to construct thermal generating power plants and to acquire portions of their capacity.  [*Id.* ¶ 16.]  The Secretary submitted his plan to

---

[1]   Along with this Motion, CAWCD has filed a Request for Judicial Notice ("RJN") of public records attached thereto and referenced herein as Ex. 1 to Ex. 4.

COHEN DOWD QUIGLEY

1  Congress on September 30, 1969 (the "1969 Plan").  [*Id.* ¶ 17.]  The 1969 Plan proposed that

2  the United States enter into a participation agreement with specified non-federal utility

3  companies to construct NGS on Navajo Nation land.  [*See id.* ¶¶ 1, 17, 18.]  Under the 1969

4  Plan, the United States acquired 24.3% of the generating capacity of NGS.  [*Id.* ¶¶ 4, 17-19,

5  35.]  The 1969 Plan, including the specification of NGS' ownership structure, cannot change

6  without Congressional approval.  [*See id.* ¶ 17 ("Because Congress approved the 1969 Plan, the

7  Secretary of the Interior cannot change the plan without congressional approval.").]

8         The relationship between CAWCD and the Secretary is contractual. *See CAWCD*, 32 F.

9  Supp. 2d at 1123. In 1987, the United States transferred to CAWCD the responsibility of

10  operating and maintaining portions of the CAP under the O&M Transfer Contract. *Id.* at

11  1124. [*See* Compl. ¶¶ 23-24.]  Once the United States completed the construction of CAP, it

12  entered into an Operating Agreement with CAWCD for CAWCD to operate and maintain

13  CAP.  [Compl. ¶ 25.]  Plaintiffs do not allege (as they cannot) that the O&M Transfer Contract

14  or Operating Agreement require CAWCD to use NGS power for CAP pumping requirements

15  or even mention NGS.

16         NGS historically provided much—but <u>not</u> all—of the energy needed for CAP's

17  pumping requirements to CAWCD at cost.  [*Id.* ¶¶ 2, 35.]  As authorized by Congress, the

18  Secretaries of the Interior and Energy have planned for and contracted with CAWCD to

19  obtain and use other sources of power before using NGS power so that the United States'

20  excess NGS capacity ("Navajo Surplus") can be sold in the energy market.  [*See, e.g.,* Ex. 1,

21  Amended Navajo Power Marketing Plan, 72 Fed. Reg. 54289 (Sept. 24, 2007) ("Marketing

22  Plan") ¶ V(A); Ex. 2, Western Contract, Operating Proc. 1, Rev. 1 §§ 4.5, 6.1.2, 6.1.3, 6.1.5.]

23  CAWCD obtains power from sources other than NGS, including, *inter alia,* the Hoover Power

24  Plant.  [*Id.*; *see also* Compl. ¶ 2 (admitting "most" of CAP's power is from NGS).]

25         On November 30, 2017, the United States announced that the owners of NGS elected

26  to cease operating NGS in December 2019.  [Compl. ¶¶ 4, 27; *see* Ex. 3*,* Nov. 30, 2017 DOI

27  Press Release.]  CAWCD had no role in the owners' decision to close NGS, but, as the "single

28  largest consumer of NGS power" [Compl. ¶ 36], is directly impacted by that decision.  In

COHEN DOWD QUIGLEY

3

response, CAWCD prudently sought proposals for the supply of portions of CAP's post-2019 power requirements to ensure its power needs will be met and water can be delivered when NGS stops power production, as the owners have planned.  [*See id.* ¶¶ 27, 30.]

Unable to force the NGS owners to continue operating the plant for Plaintiffs' financial benefit, Plaintiffs have illogically sued an NGS customer, CAWCD, for relief to which they are not entitled and which this Court lacks authority to award.

## II.   THE COURT LACKS SUBJECT MATTER JURISDICTION.

Lack of subject matter jurisdiction is grounds for dismissal under Fed. R. Civ. P. 12(b)(1).  Plaintiff bears the burden to establish that subject matter jurisdiction exists.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998).  "Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies."  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990); U.S. Const. Art. III, § 2.  "The controversy must be definite and concrete.… It must be a real and substantial controversy [for] specific relief through a decree of a conclusive character, [not] an opinion advising what the law would be upon a hypothetical state of facts."  *Smith v. Am. Asiatic Underwriters, Fed., Inc., U.S.A.*, 127 F.2d 754, 756 (9th Cir. 1942), *on reh'g*, 134 F.2d 233 (9th Cir. 1943) (citations omitted).  If no actual case or controversy exists because the plaintiffs lack standing or their claims are not ripe, the complaint must be dismissed for lack of subject matter jurisdiction.  *See Preiser v. Newkirk*, 422 U.S. 395 (1975) (dismissing complaint on grounds that it sought an advisory opinion because the pleadings were both moot and speculative).  Here, the Complaint fails to establish the existence of a justiciable case or controversy as required for subject matter jurisdiction.

### A.   The Plaintiffs Lack Standing.

Rooted in the Article III case or controversy requirement is the "irreducible constitutional minimum" of standing.  *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). Plaintiffs bear the burden to establish standing by showing (1) they suffered an injury in fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) the injury is likely to be redressed by a favorable judicial decision.  *Id.* at 1547 (*citing Lujan v. Def. of Wildlife,* 504 U.S. 555, 560-61 (1992)); *see also San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th

COHEN DOWD QUIGLEY

Cir. 1996) (where plaintiffs seek declaratory and injunctive relief only, they are required to show a very significant possibility of future harm).   Plaintiffs "must 'clearly allege facts demonstrating' each element." *Spokeo,* 136 S.Ct. at 1547 (*quoting Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  Plaintiffs have not alleged sufficient facts to satisfy any element of standing.

       1.   <u>Plaintiffs' Alleged Harm Is Uncertain, Conjectural And Speculative</u>.

     "To establish injury in fact, a plaintiff must show that [it] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S.Ct. at 1548 (*citing Lujan,* 504 U.S. at 560 ).   An injury is not concrete unless it "actually exist[s]." *Id.*  (injury must be "'real,'…not 'abstract'").  Future injury may satisfy the imminence requirement only "if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur." *Mont. Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1189 (9th Cir. 2014) (citation omitted).  Injury that is speculative or remote—like Plaintiffs' alleged threatened injuries—is insufficient to confer standing. *See O'Shea v. Littleton*, 414 U.S. 488, 497-98 (1974).

     Plaintiffs have no legal relationship with CAWCD.  The controversy alleged in the Complaint does not touch the legal relations of parties with adverse legal interests.  *Smith*, 127 F.2d at 756.  Moreover, Peabody (barely mentioned in the Complaint) has not suffered any harm and alleges only the threat of future economic harm.   A lengthy series of contingencies—none of which CAWCD has any control over—must occur before Peabody's theoretical injuries become actual or imminent.  *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (plaintiffs' allegations of future injury were "speculation and conjecture" and outside the Court's jurisdiction); *Reilly v. Ceridian Corp.*, 664 F.3d 38, 43 (3d Cir. 2011) (where "one cannot describe how the [plaintiffs] will be injured without beginning the explanation with the word 'if[;]'  [t]he prospective damages, described by the [plaintiffs] as certain, are, in reality, conjectural" (citation omitted)); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983). Peabody alleges that *if* CAWCD procures power beyond 2019 from sources other than NGS, and *if* as a result a potential buyer is less willing to acquire and operate NGS, and *if* NGS closes as a result, "the Kayenta Mine, which exists solely to supply NGS, will close too absent

unforeseen circumstances."  [Compl. ¶¶ 4, 34.]  Peabody's alleged future harm is too uncertain, conjectural and attenuated to satisfy the injury in fact requirement for standing.

The UMWA does not allege any injury as an organization; it brings this action on behalf of "340 employees who work at the Kayenta Mine." [Compl. ¶ 7.] For associational standing, however, UMWA must establish that its members would otherwise have standing to sue in their own right.  *See Associated Gen. Contractors of Am. Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).[2]  Like Peabody, the mine workers' alleged future threatened injuries (*i.e.*, the loss of their jobs) are uncertain, speculative and conjectural, dependent on events over which CAWCD has no control and, thus, insufficient to establish an injury in fact fairly traceable to CAWCD.  "*If* CAWCD continues to make statements that it is not obligated to buy power from NGS or continues to enter into contracts with new suppliers" for CAP's power requirements post-2019, and *if* all six potential buyers are independently dissuaded to purchase NGS as a result of CAWCD's position, and *if* NGS ultimately closes as a result of the buyers deciding not to purchase an interest in NGS as a result of CAWCD's conduct, and *if* Peabody closes the Mine as a result, only then might UMWA suffer an injury. [Compl. ¶¶ 4, 34, 37.] *See Whitmore*, 495 U.S. at 158; *Reilly*, 664 F.3d at 43; *Lyons*, 461 U.S. at 102-03.  Simply stating UMWA's theory of liability reveals its attenuation and UMWA's lack of standing.

Like UMWA, the Hopi Tribe's threatened future injury (*i.e.*, loss of revenues relating to operation of the Mine) relies on the same uncertain, speculative and conjectural series of events, which are insufficient to confer standing.  [*See* Compl. ¶¶ 4, 34, 37.]  *See also Whitmore*, 495 U.S. at 158; *Reilly*, 664 F.3d at 43*; Lyons*, 461 U.S. at 102-03.

       2.    <u>Plaintiffs Cannot Demonstrate A Causal Connection Between Their Injuries And CAWCD's Conduct.</u>

To establish the causation element of standing, "Plaintiffs must show that the injury is causally linked or 'fairly traceable' to [the defendant's] alleged misconduct, and not the result of misconduct of some third party not before the court."  *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013) (*citing Lujan*, 504 U.S. at 560-61); *see also Clapper v. Amnesty Int'l*

---

[2]  UMWA would also need to identify at least one individual member with standing who has suffered an injury in fact.  *See id.*  UMWA has failed to make this showing.

COHEN DOWD QUIGLEY

*USA*, 568 U.S. 398, 414 (2013) ("[P]laintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" (citation omitted)).   A causal chain with several links fails if any of those links is hypothetical, tenuous, or implausible.  *Bellon*, 732 F.3d at 1141-42.  "[W]here the causal chain involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, … the causal chain is too weak to support standing." *Id.* (citations omitted).  Here, Plaintiffs cannot make the required causal showing.

There is no injury or threatened injury fairly traceable to CAWCD's actions, as opposed to the actions of third parties over whom CAWCD has no control.   CAWCD's solicitation of proposals to supply a relatively small portion of CAP's future energy needs (to ensure a power supply given NGS' announced closure) is not a plausible cause of Plaintiffs' threatened injuries.  The genesis of Plaintiffs' possible future harm is the NGS owners' decision to cease operating NGS after 2019.  [*See* Compl. ¶ 27.]  CAWCD does not control the decision to close NGS, and it is illogical to suggest that theoretical potential buyers will base their purchase decisions on whether CAWCD buys all, some or none of CAP's power requirement from NGS since there is no profit in selling to CAWCD, which pays cost for NGS power.   [*Id.* ¶ 35.]  Similarly, the UMWA and Hopi Tribe's even more remote threats of harm depend upon Peabody's decision to close the Mine, rather than sell its coal elsewhere.   Third parties' independent decisions to close NGS (and the Mine) break any causal link between CAWCD's conduct and Plaintiffs' alleged harm.[3]

        3.    Plaintiffs' Alleged Injuries Will Not Be Redressed By A Favorable Decision From This Court.

To satisfy the last element required for standing, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S.

---

[3]  Plaintiffs' allegation that CAWCD's continued procurement of power from other sources might dissuade unidentified buyers from purchasing NGS does not cure the missing causal link.  [*Id.* ¶ 35.]  Plaintiffs' claim is premised on the fallacy that a reasonable buyer might not buy NGS unless it is guaranteed the ability to sell under 24.3% of NGS's output *at cost* to CAWCD, as opposed to being able to sell NGS energy for profit on the open market.

COHEN DOWD QUIGLEY

at 561 (citation omitted).   Plaintiffs' claim that their alleged threatened injuries will be redressed by requiring CAWCD to acquire CAP's power requirements from NGS so long as NGS remains open is wishful at best.   The NGS owners have already decided to close NGS after 2019.   While Plaintiffs allege potential buyers exist [Compl. ¶ 29], those unidentified prospects could decide not to buy for any number of reasons (*e.g.*, lack of demand for uneconomical power).   None of the predicted harms will be ameliorated if the Court enters the requested injunctive relief and NGS still closes (which, as of now, is set to occur).

Finally, even if NGS remains open, Plaintiffs' injuries may still occur regardless of a favorable decision by this Court.   By way of example only, NGS may cease purchasing coal from the Mine if cheaper alternative sources of coal are available elsewhere.   *See Peabody W. Coal Co. v. Navajo Nation*, 860 F. Supp. 683, 687 (D. Ariz. 1994) ("The 1969 NGS lease did not require that the NGS participants purchase or obtain coal for use at the NGS from sources within the Navajo Reservation or within the [Joint Use Area]; they were free to purchase coal from any supplier."). [*See also* Compl. ¶ 8 (admitting Peabody supplies coal from the Mine to NGS pursuant to a Coal Supply Agreement).]   Even under Plaintiffs' theory, if NGS does not generate energy at competitive rates, the Mine would likely close and result in the exact injuries Plaintiffs now fear regardless of a declaration and injunction directed at CAWCD.   As Plaintiffs cannot demonstrate any of the required elements of standing, the Court should dismiss the Complaint for lack of subject matter jurisdiction.

**B.   Plaintiffs' Claims Are Not Ripe.**

A claim does not present an actual case or controversy, and thus fails to satisfy Article III of the United States Constitution, unless it is ripe for judicial review.   Ripeness has two components:  constitutional and prudential.   *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc).   The constitutional ripeness of a declaratory judgment action depends upon "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *accord Coons v. Lew*, 762 F.3d 891, 898 (9th Cir.

COHEN DOWD QUIGLEY

8

2014), *as amended* (Sept. 2, 2014) (future financial harm based on allegation that health care providers and the market *might* react negatively was "too speculative to satisfy the constitutional requirement of ripeness" where direct injury in fact had not yet occurred and was not "certainly impending" because it was "contingent on a series of events" including government action that may never occur).  Prudential ripeness, in comparison, is guided by two overarching considerations: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.  *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812-13 (2003).  Under either analysis, Plaintiffs' claims against CAWCD are unripe and should be dismissed.

Where, as here, a plaintiff seeks declaratory and injunctive relief based on a speculative course of future conduct which threatens potential injury that is not actual or imminent, the claims lack constitutional ripeness and the court lacks subject matter jurisdiction.  *See, e.g., Stewart v. M.M. & P. Pension Plan*, 608 F.2d 776, 784 (9th Cir. 1979) (dismissing complaint as seeking an advisory opinion because "it is at best a claim that when, seven years from now, plaintiff is old enough to be entitled to apply for [pension] benefits, the trustees will deny his application on the basis of the 90/10 rule, which he claims is illegal[;] [s]uch a claim is not ripe for adjudication"); *Swedlow, Inc. v. Rohm & Haas Co.*, 455 F.2d 884 (9th Cir. 1972). "[I]n many cases, ripeness coincides squarely with standing's injury in fact prong.…  Indeed, because the focus of our ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline." *Mont. Envtl. Info. Ctr.*, 766 F.3d at 1189 (citations and quotes omitted).

Here, the potential future injuries Plaintiffs assert are not actual or imminent.  Rather, they turn on a sequence of events, beyond CAWCD's control, that may or may not occur, and may or may not lead to the closure of NGS and the consequential harm Plaintiffs predict.  In *Swedlow,* for example, defendant was constructing a building which, when finished, would be used to infringe on plaintiff's patents.  Plaintiff sought a declaratory judgment for anticipated infringement and to enjoin defendant from completing construction of the plant.  455 F.2d at 885.  The Ninth Circuit affirmed dismissal for lack of subject matter jurisdiction, finding "[i]n reality this complaint seeks an advisory opinion that if and when defendant completes the

1  plant now under construction, assuming there are no material changes in the intervening

2  period, the present acts of the defendant not only threaten, but in fact constitute an

3  infringement of plaintiff's patents." *Id.*  The alleged "threats of future infringement" were

4  "too remote and unduly speculative" to establish an actual, justiciable controversy.  *Id.* at 886.

5        Plaintiffs' asserted future injury here is even more remote than in *Swedlow*.  The

6  Complaint alleges that *if* CAWCD is required to purchase its power requirements from NGS

7  as long as NGS remains "open" (including after 2019), a *potential* buyer *might* purchase some

8  portion of NGS *if* the buyer is willing to close the deal after completing due diligence.

9  Plaintiffs do not allege any facts establishing that CAWCD has <u>any</u> duty to obtain power from

10 NGS merely because NGS remains "open." Nor do they define what "open" means.

11 Currently, NGS is to remain "open" after 2019 solely for purposes of retiring the facility and

12 remediating the site, with no coal combustion.  [Ex. 3, DOI Press Release.]   Certainly,

13 CAWCD cannot buy power from NGS if it is not generating any power.

14       Assuming "open" means "continuing to generate power" under *potential* new

15 ownership, this would be a material change to the 1969 Plan.  Plaintiffs admit that any change

16 to the 1969 Plan requires new Congressional approval.  [Compl. ¶ 17.]  A significant part of

17 the 1969 Plan concerned the Secretary's economic feasibility analysis, who the NGS owners

18 would be, and their respective ownership shares.  Plaintiffs have not alleged (as they cannot)

19 that any new plan by the Secretary would necessarily include power generation at NGS or that

20 Congress would approve of whatever ownership structure the Complaint contemplates (but

21 does not define).[4]  Thus, beyond the uncertainty of a buyer's decision, there is no guarantee

22 that Congress will approve of a reconfigured NGS for any reason, whatever the new

23 ownership structure might be.

24       And, current law does not require CAWCD to use NGS power to meet CAP's pumping

25 needs. The Secretaries of Energy and Interior recognize CAWCD's ability to use *other* power to

26 operate CAP *before* using NGS power.  [*See, e.g.,* Ex. 1, Marketing Plan at ¶ V(A); Ex. 2, Western

---

[4]  The Secretary has acknowledged that any new plan might <u>not</u> include NGS.  [*See* Ex. 4, June 1, 2018 Letter from DOI Assistant Secretary T. Petty.]

COHEN DOWD QUIGLEY

10

Contract, Operating Proc. 1, Rev. 1 §§ 4.5, 6.1.2, 6.1.3, 6.1.5.]  Thus, assuming all of the contingencies discussed above occurred, CAWCD *still* would not be required to purchase all of its pumping power from NGS, either now or for as long as NGS remains "open."

For all of these reasons, Plaintiffs' purported injuries are too remote and not sufficiently immediate or concrete to warrant a declaratory judgment or injunction against anyone, least of all CAWCD.  And if, as Plaintiffs contend, CAWCD cannot make arrangements to ensure CAP's access to economical power after 2019 and if the current owners close NGS in December 2019 as presently intended, CAWCD will be in the absolutely untenable position of not having secured access to the energy necessary to meet its obligations to the United States or the many CAP users who depend on CAWCD's delivery of vital CAP water.  The risk and imprudence of Plaintiffs' requested relief is manifest.[5]

## III.   THE   COMPLAINT   SHOULD   BE   DISMISSED   BECAUSE INDISPENSABLE PARTIES CANNOT BE JOINED.

An action may be dismissed pursuant to Rule 12(b)(7) where a party has failed to join a party under Rule 19.  Dismissal is warranted where (1) the absent party is necessary, or must be joined, and (2) the necessary but absent party cannot be joined and, in equity and good conscience, the action should be dismissed.  *See Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1163 (9th Cir. 2002) (affirming dismissal of complaint for failure to join Navajo Nation as an indispensable party).

### A.   There Are Multiple Absent Parties Necessary To This Action.

Assuming *arguendo* that any Plaintiff has standing and ripe claims (they do not), there are multiple absent, but necessary, parties holding protected interests in deciding whether CAWCD is obligated to purchase its CAP power from NGS.[6]  *See Paiute-Shoshone Indians of*

---

[5]  Even if Plaintiffs' claims were constitutionally ripe, they should still be dismissed as a prudential matter because they are not fit for judicial decision.  *See, e.g., Nat'l Park Hosp. Ass'n*, 538 U.S. at 812-13 (2003) (ordering dismissal for lack of prudential ripeness where dispute about "purely legal" question of validity of a legal rule could impact plaintiffs' future business but factual development was not sufficiently concrete).

[6]  The Rule 19 analysis is moot if the Court determines that Plaintiffs lack standing or that their claims are not ripe for adjudication.

11

COHEN DOWD QUIGLEY

*Bishop Cmty. of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 997 (9th Cir. 2011) (non-party is required if it "has a 'legally protected interest' in the action that would be 'impaired or impeded' by adjudicating the case without it" (citation omitted)).  The interest holders and their interests include:

i.  The Secretary of Interior is a necessary party because, in addition to the reasons explained in subsection iii, *infra*, the United States—not CAWCD—is the beneficial owner of 24.3% of NGS.  [Compl. ¶ 19.]  Plaintiffs' claim against CAWCD is dependent on the United States owning a share of NGS after 2019—a result that CAWCD cannot control.

ii.  The Secretary of Energy, through Western Area Power Authority ("Western"), is required to regulate and administer power marketing plans in the western United States and market Navajo Surplus power.  *See* Hoover Power Plant Act of 1984, Pub. L. 98-381 ("Hoover PPA") at § 107; Ex. 1, Marketing Plan.  Any amount of NGS energy CAWCD takes for CAP pumping needs impacts the capacity available to generate NGS Surplus.

iii.  The Navajo Nation is interested in NGS because NGS operates on Navajo land through a lease under which coal combustion must cease in December 2019.[7]  [*See* Ex. 3, DOI Press Release.]  *Cf. Hopi Tribe v. U.S. Envtl. Prot. Agency*, 851 F.3d 957, 959 (9th Cir. 2017).  Continued coal combustion at NGS after 2019 is contingent upon negotiating a new lease with the Navajo.  *See, e.g., Peabody Coal Co. v. Navajo Nation*, 75 F.3d 457, 462-63 (9th Cir. 1996) (Navajo Nation exerts exclusive governmental interest with respect to its land).  [*See also* Compl., ¶ 1.]  The Navajo and Hopi share the same interest in the fate of the Mine.  [*See* Compl., ¶¶ 20, 37-38 ("The Kayenta Mine is located on tribal trust lands that Peabody [] leases from two Native American tribes, including the Hopi Tribe[;] The economic benefits of the Kayenta Mine and NGS are profound.").]  This interest does not confer standing on the Hopi or the Navajo, but if the Hopi are deemed to have standing, so should the Navajo.

iv.  The Gila River Indian Community ("GRIC"), the Tohono O'odham Nation,

---

[7]  The NGS co-owners are also interested in this action.  *See Yazzie v. U.S. Envtl. Prot. Agency*, 851 F.3d 960, 965 (9th Cir. 2017) (identifying NGS' co-tenants). [*See also* Compl. ¶¶ 4, 19.] Plaintiffs implicitly acknowledge that the non-federal owners cannot be forced to continue generating NGS power after 2019.

COHEN DOWD QUIGLEY

and certain Arizona Indian Tribes have vested rights in their allocations of CAP water.  If Plaintiffs' claims survive, these tribes would have a corresponding interest in the water rates they would have to pay if CAWCD is forced to buy uneconomical NGS power, pursuant to the AWSA, Pub. L. No. 108-451 (2004).[8]  If Plaintiffs are determined to have standing based upon their alleged economic self-interest in CAWCD's ongoing purchase of power from NGS, these tribes would have standing based on the impact Plaintiffs' claims would have on the prices these tribes have to pay for CAP water.

Once the necessary but absent parties are identified, the Court will order their joinder unless it determines that they cannot feasibly be joined.  *See* Fed. R. Civ. P. 19(a)(2).

**B.   Numerous Necessary Parties—The United States, The Navajo Nation, And The Tohono O'odham Nation—Cannot Be Joined.**

Several necessary but absent parties—including the United States, the Tohono O'odham Nation and the Navajo Nation—have sovereign immunity and cannot feasibly be joined in this action.[9]  The Ninth Circuit has repeatedly acknowledged the sovereign immunity of the United States and federally recognized Indian tribes.  *See, e.g.*, *Tobar v. U.S.*, 639 F.3d 1191, 1195 (9th Cir. 2011) ("[T]he United States, as sovereign, is immune from suit save as it consents to be sued[.]"); *see also Dawavendewa*, 276 F.3d at 1159-61 (absent Navajo Nation could not be feasibly joined because it is a federally recognized Indian tribe with sovereign immunity and  may not be sued absent an express, unequivocal waiver or abrogation of tribal immunity by Congress); *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996) (sovereign immunity of Navajo Nation and Hopi Tribe prevented involuntary joinder without waiver of immunity).

A waiver of sovereign immunity must be "clearly evident from the language of the statute" such that the government's consent to be sued shall never be enlarged "beyond what a fair reading of the text requires."  *F.A.A. v. Cooper*, 566 U.S. 284, 290 (2012) ("We have said on many occasions that a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text.").  There is no allegation that the United States or any of the tribes has waived its sovereign immunity and consented to be joined in this private claim seeking a declaration of

COHEN DOWD QUIGLEY

---

[8]   On July 19, 2018, GRIC filed a motion to intervene in this lawsuit.  [Doc. 18.]
[9]   "United States" here refers to the Secretary, Western and the U.S. Bureau of Reclamation.

rights under the CRBPA.  To the contrary, Congress has set forth the circumstance in which the United States may be joined in an action to enforce the provisions of the CRBPA:  where a federal officer or agency fails to comply with the Act, an *affected State* may maintain an action to enforce the Act *in the Supreme Court*.  *See* 43 U.S.C. § 1551(c).  Plaintiffs are not an "affected State" and have not pled facts within § 1551(c)'s narrow consent provision.  Thus, the United States remains immune.

**C.   Equity And Good Conscience Support Dismissal.**

The United States and the Indian tribes' sovereign immunity compels dismissal of this action.  *White v. Univ. of Cal.*, 765 F.3d 1010, 1028 (9th Cir. 2014) (acknowledging that virtually all cases considering indispensability where the necessary party is immune "appear to dismiss" if the absentee is an immune Indian tribe).   Under the traditional Rule 19 analysis, four factors bear on the indispensability of an absent party:  (i) the extent to which a judgment rendered in its absence might prejudice it or existing parties; (ii) the extent to which any prejudice can be avoided in shaping the relief; (iii) whether a judgment rendered in its absence will be adequate; and (iv) whether the plaintiff will have an adequate remedy if the action is dismissed.  *See E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005).  However, "[i]f the necessary party is immune … there may be 'very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor.'"  *Kescoli*, 101 F.3d at 1311 (citation omitted); *see also Dawavendewa*, 276 F.3d at 1162.

Here, the Indian tribes would suffer prejudice if this action proceeded in their absence given their competing interests in the activities conducted on their sovereign land (the Navajo Nation) and in securing the lowest cost for CAP water (GRIC and the Tohono O'odham Nation), as would the United States given, *inter alia*, the Secretary's beneficial ownership interest in NGS.  *See Makah Indian Tribe v. Verity*, 910 F.2d 555, 560 (9th Cir. 1990) (third factor not met where request for equitable adjustment required input from all of the tribes).  Accordingly, as several Indian tribes and the United States are necessary to this action but cannot be involuntarily joined as a result of their sovereign immunity, this action must be dismissed under Rule 12(b)(7).

COHEN DOWD QUIGLEY

## IV.     **THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF**.

Pursuant to Rule 12(b)(6), dismissal "can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim." *Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 109 F. Supp. 3d 1178, 1181 (D. Ariz. 2014).  To survive a motion to dismiss, a complaint must contain sufficient, non-conclusory factual allegations to plausibly suggest a claim entitling the plaintiff to relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Rule 12(b)(6) serves the important role of eliminating causes of action that are flawed in their legal or factual premises and sparing "litigants the burdens of unnecessary pretrial and trial activity."  *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993).  A plaintiff cannot meet its burden simply by contending that it "might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 550 U.S. at 561-62. There must be a showing, rather than a blanket assertion, of entitlement to relief.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 662 (quoting *Twombly*, 550 U.S. at 557). The Court need not accept "legal conclusions cast in the form of factual allegations" that are unsupported when considering a motion to dismiss.  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

### A.   **Plaintiffs Have No Private Right Of Action Under The CRBPA.**

Plaintiffs' claim appears to be based entirely on the CRBPA.  [Compl. ¶ 46 ("Plaintiffs seek a declaration that Section 303 of [CRBPA] obligates CAWCD to acquire CAP's power requirements from NGS…").]  But, the CRBPA creates <u>no</u> private right of action.  Where plaintiffs seek relief under a federal law that provides no private right of action, they fail to state a claim for which relief can be granted.  *See Long v. Salt River Valley Water Users' Ass'n*, 820 F.2d 284, 286-89 (9th Cir. 1987) (affirming dismissal for failure to state a claim because reclamation laws do not provide a private cause of action).  Further, the Ninth Circuit has held that private parties have no private right of action against one another to redress alleged violations of reclamation laws, including "[t]he 1902 Act, the [Boulder Canyon Project Act],

1   and the CRBPA." *Id.*  Thus, Plaintiffs have no right of action here.

2       Nor can Plaintiffs use the Declaratory Judgment Act, 5 U.S.C. §§ 2201-2202, to create a

3   private right of action where none exists as a matter of law.  "[T]he Declaratory Judgment Act

4   does not by itself confer federal subject-matter jurisdiction[.]" *N. Cnty. Commc'ns Corp. v. Cal.*

5   *Catalog & Tech.*, 594 F.3d 1149, 1154 (9th Cir. 2010) (citations omitted).  Because Section 303

6   of the CRBPA does not confer a private right of action, Plaintiffs cannot create one through

7   the pretext of seeking a declaration about what Section 303 means.  Nor may they maintain an

8   action for injunctive relief absent an independent plausible claim for relief, which Plaintiffs

9   have not pled.  Their claim fails as a matter of law.

    **B.**  **Plaintiffs Fail To Point To A Specific Duty Imposed By Law Or Contract That Obligates CAWCD To Purchase CAP Power From NGS.**

12       Plaintiffs proclaim without support that Section 303 of the CRBPA requires CAWCD

13   to purchase all of CAP's power requirements from NGS so long as NGS remains open.

14   [Compl. ¶¶ 36, 46.]  Contrary to Plaintiffs' bare allegation, the plain language of Section 303

15   does not impose any such requirement upon CAWCD.  If that is what Congress had intended,

16   it would have said so; but CAWCD did not even exist when the CRBPA was enacted.  Instead,

17   Congress required the Secretary to develop marketing plans that in his discretion would

18   optimize the availability of Navajo Surplus power.  *See* Hoover PPA at § 107.  The Secretary

19   then did so by contracts that, among other things, acknowledge CAWCD's ability to obtain

20   power from other sources – including Hoover, New Waddell and the open market.  [*See, e.g.*,

21   Ex. 1, Marketing Plan at ¶ V(A) ("To optimize the availability of Navajo Surplus, CAWCD

22   shall utilize, for CAP pumping requirements, Hoover capacity and energy scheduled from

23   Hoover Dam…"); Ex. 2, Western Contract, Operating Proc. 1, Rev. 1 §§ 4.5, 6.1.2, 6.1.3,

24   6.1.5.]  Plaintiffs' interpretation of Section 303 is erroneous—belied by the statute's plain

25   language and the positions two federal agencies have taken in their contracts with CAWCD,

26   which recognize that CAWCD may use non-NGS power. [*See, e.g., id.*; Compl. ¶ 2.]

27       The Complaint never identifies the specific authority for Plaintiffs' assertion that

28   CAWCD must obtain CAP's pumping power from NGS for as long as NGS remains open.

COHEN DOWD QUIGLEY

Although Plaintiffs identify various contracts in the Complaint, none of those contracts imposes such an obligation. [Compl. ¶¶ 18-19, 22-25.] Plaintiffs do not allege (as they cannot), for example, that the O&M Transfer Contract or the Operating Agreement require CAWCD to obtain its power requirements from NGS. And, Plaintiffs are neither parties to nor third party beneficiaries under the various contracts they cite. The NGS owners are the only parties to the Participation Agreement and Co-Tenancy Agreement, and CAWCD and the United States are the only parties to the Master Repayment Contract, O&M Transfer Contract, and Operating Agreement. Therefore, even if one of the contracts Plaintiffs cite supported their position (and none do), Plaintiffs cannot enforce or challenge those agreements. *See, e.g.*, *Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1034 (9th Cir. 2005) (reciting prior conclusions that "nonparties to federal water reclamation contracts were not intended beneficiaries of the contracts, even though the contracts operated to the nonparties' benefit and were entered into with them in mind") (*citing Orff v. U.S.*, 358 F.3d 1137, 1147 (9th Cir. 2004); *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1212 (9th Cir. 1999) (parties who benefit from a government contract are generally incidental beneficiaries and may not enforce the contract absent clear intent to the contrary)).

Finally, Plaintiffs' bare inclusion of the words "preemption" and "ultra vires" in their Complaint without any discussion of their application to the facts does not salvage their claim. Plaintiffs are mistaken in alleging that federal law preempts CAWCD's decision that it is not obligated to purchase CAP's power requirements from NGS. [Compl. ¶ 47.] They have already acknowledged that CAWCD does not buy all of its power from NGS. [*Id.* ¶ 2.] Plaintiffs have not alleged facts sufficient to state a plausible claim that entitles them to a declaration that CAWCD's purchase of power from sources other than NGS is ultra vires or preempted by federal law.

## V.    **CONCLUSION**.

CAWCD respectfully requests that the Court dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction, failure to join indispensable parties and failure to state a claim.

. . .

COHEN DOWD QUIGLEY

RESPECTFULLY SUBMITTED this 2nd day of August, 2018.

COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona  85016

By:      /s/   Daniel G. Dowd
         Daniel G. Dowd
         Stacey F. Gottlieb
         Lauren M. LaPrade
         Kaysey L. Fung

Jay M. Johnson
CENTRAL ARIZONA WATER
CONSERVATION DISTRICT
23636 North 7th Street
Phoenix, Arizona 85024

   Attorneys for Defendant Central Arizona
   Water Conservation District

COHEN DOWD QUIGLEY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

18

**CERTIFICATION OF CONFERRAL**

Pursuant to LRCiv 12.1 and this Court's Preliminary Order (Doc. 8), undersigned counsel for the Central Arizona Water Conservation District certify that opposing counsel have been notified in writing of the issues asserted in the foregoing Motion to Dismiss and that the parties conferred telephonically but were unable to agree that Plaintiffs' Complaint (Doc. 1) was curable in any part by a permissible amendment, and Plaintiffs offered none.

By:     */s/   Daniel G. Dowd*
        Daniel G. Dowd



COHEN DOWD QUIGLEY

19

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on August 2, 2018, I electronically transmitted the foregoing

3    document to the Clerk's office using the CM/ECF System for filing and transmittal of a

4    Notice of Electronic Filing to the following CM/ECF registrants:

5

6    Colin Campbell
     Grace Rebling
7    OSBORN MALEDON
     2929 North Central Avenue
8    Phoenix, AZ 85012
     grebling@omlaw.com
9    ccampbell@omlaw.com
10   *Attorneys for the Hopi Tribe*

11   John Shadegg
     Eric E. Lynch
12   POLSINELLI
     One East Washington, Suite 1200
13   Phoenix, AZ 85004
     jshadegg@polsinelli.com
14   elynch@polsinelli.com
15   *Attorneys for Peabody Western Coal Company*

16   Matthew C. Corcoran (*pro hac vice*)
     JONES DAY
17   325 McConnell Boulevard, Suite 600
     Columbus, OH 43215-2673
18   mccorcoran@jonesday.com
19   *Attorneys for Peabody Western Coal Company*

20   Linus Everling
     Thomas L. Murphy
21   GILA RIVER INDIAN COMMUNITY
     Office of General Counsel
22   Post Office Box 97
     Sacaton, Arizona 85147
23   linus.everling@gric.nsn.us
     thomas.murphy@gric.nsn.us
24   *Attorneys for the Gila River Indian*
     *Community (Motion to Intervene Pending)*
25

26

     By: */s/   Erik O'Malley*
27

28

Eugene M. Trisko  (*pro hac vice*)
LAW OFFICES OF EUGENE M. TRISKO
Post Office Box 596
Berkeley Springs, WV 25411
emtrisko@earthlink.net
*Attorneys for the United Mine Workers of America*

Nicholas J. Enoch
Kaitlyn A. Redfield-Ortiz
Stanley Lubin
LUBIN & ENOCH, P.C.
349 North 4th Avenue
Phoenix, AZ 85003-1505
nick@lubinandenoch.com
kaitlyn@lubinandenoch.com
stan@lubinandenoch.com
*Attorneys for the United Mine Workers of America*

Charles F. Donnelly (*pro hac vice*)
General Counsel
UNITED MINE WORKERS OF
AMERICA
18354 Quantico Gateway Dr. #200
Triangle, VA 22172
cdonnelly@umwa.org
*Attorneys for the United Mine Workers of America*

Jay M. Johnson
CENTRAL ARIZONA WATER
CONSERVATION DISTRICT
23636 North 7th Street
Phoenix, Arizona 85024
jjohnson@cap-az.com

COHEN DOWD QUIGLEY