IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hopi Tribe, et al.,<br><br>               Plaintiffs,<br>vs.<br><br>Central Arizona Water Conservation District, et al.,<br><br>               Defendants. | No. CV-18-01337-PHX-SPL<br><br>**ORDER** |

Before the Court are Defendant Central Arizona Water Conservation District's ("CAWCD") Motion to Dismiss (Doc. 22), CAWCD's Motion for Judicial Notice (Doc. 23), Intervenor-Defendant Gila River Indian Community's (the "Community") Motion to Dismiss (Doc. 36), Plaintiffs' Joint Response (Doc. 41), CAWCD's Reply (Doc. 46), and the Community's Reply (Doc. 47). Oral argument is requested but denied.[1]

**I.   Background[2]**

    **A.   Factual Background**

This case arises out of the announced closing of the Navajo Generating Station ("NGS"), a power plant located near Page, Arizona. (Doc. 1 ¶ 1.) NGS is located on Native American lands, and the Kayenta Mine, also on tribal land, provides its fuel requirements.

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

[2] The following facts are drawn in Plaintiffs' favor.

(Doc. 1 ¶ 1.) The Hopi Tribe made their lands available for the mine with the understanding that NGS would create revenues for the Hope Tribe until at least 2044. (Doc. 1 ¶ 1.) Peabody Western Coal Company ("Peabody") owns and operates the Kayenta Mine, which supplies coal to NGS. (Doc. 1 ¶ 8.) The United Mine Workers of America ("UMWA") represent approximately 340 employees of the Kayenta Mine. (Doc. 1 ¶ 7.) The Kayenta Mine and NGS are important to the welfare of the Hope Tribe and Page, Arizona. (Doc. 1 ¶ 37.) The Kayenta Mine employs 345 people, many Native Americans, and, between it and NGS, supports thousands of jobs and employs 845 people. (Doc. 1 ¶ 37.) The Hopi Tribe receives substantial royalties from the Kayenta Mine. (Doc. 1 ¶ 39.) Other Indian tribes in Arizona also benefit from NGS. (Doc. 1 ¶ 41.)

In February 2017, the non-federal NGS owners (the "NGS owners") announced their intent to close NGS at the end of 2019. (Doc. 1 ¶ 27.) NGS stakeholders began actively looking for buyers willing to run NGS after 2019. (Doc. 1 ¶ 27.) CAWCD, the entity in charge of fulfilling the Central Arizona Project's ("CAP") water requirements, which is also NGS's single, largest consumer, began pursuing alternative sources of power for that need. (Doc. 1 ¶¶ 24, 27, 36.) In November 2017, the Secretary of the Interior asked CAWCD to commit to purchasing its power from NGS after 2019, if NGS remained open, but CAWCD declined. (Doc. 1 ¶ 28.) On April 5, 2018, CAWCD announced at its board meeting that it was not legally obligated to buy power from NGS beyond 2019, even if NGS remained open. (Doc. 1 ¶ 32.) An interested buyer came forward, the Avenue Capital Group and Middle River Power (collectively, "Middle River"), and five other potential buyers expressed interest in buying NGS. (Doc. 1 ¶ 29; Doc. 41 at 10.)

CAWCD's determination that it is not obligated to buy CAP's power requirements from NGS so long as NGS remains open makes it more likely that both NGS and the Kayenta Mine will close. (Doc. 1 ¶ 36.) It will be less economical for an interested buyer to find sufficient power consumers to replace CAP's power consumption if CAWCD does not continue buying its power from NGS. (Doc. 1 ¶ 36.) As a result, it will be less economical to run NGS, and a potential buyer's interest will likely wane. (Doc. 1 ¶ 36.) If

a buyer walks away, NGS and the Kayenta Mine would close at the end of 2019 absent unforeseen developments. (Doc. 1 ¶ 36.)

### B. Procedural Background

On May 1, 2018, Plaintiffs filed their Complaint. (Doc. 1.) Plaintiffs seek a declaratory judgment against CAWCD and an injunction. They ask the Court to declare: 1) that Section 303 of the Basin Project Act obligates CAWCD to acquire CAP's power requirements from NGS so long as NGS remains open and 2) that CAWCD's decision that it is not obligated to purchase CAP's power requirements from NGS is preempted by federal law and is ultra vires. (Doc. 1 ¶¶ 46-48.) They also ask the Court to order that CAWCD acquire CAP's power requirements from NGS so long as NGS remains open. (Doc. 1 at 15 ¶ e.) On July 19, 2018, the Community moved to intervene as a defendant. (Doc. 18.)

On August 2, 2018, CAWCD filed its Motion to Dismiss and Request for Judicial Notice. (Docs. 22, 23.) On August 21, 2018, the Court granted the Community's Motion to Intervene (Doc. 35), and the Community filed its Motion to Dismiss (Doc. 36). On September 18, 2018, Plaintiffs filed a Joint Response to CAWCD's and the Community's Motions to Dismiss and its Response to CAWCD's Motion for Judicial Notice. (Doc. 41.) On October 24, 2018, CAWCD and the Community filed their Motions to Dismiss. (Docs. 46, 47.) On January 18, 2019, the parties filed a Joint Notice of a Party Interested in Acquiring NGS. (Doc. 48.)

## II. Standard

"For purposes of ruling on a motion to dismiss for want of standing, … courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *see Thornhill Publ'g Co. v. Gen. Tel. & Elecs.*, 594 F.2d 730, 733 (9th Cir. 1979). "In a facial attack, the challenger asserts that the allegations contained in the

complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039.

### III. Discussion

#### A. Judicial Notice

Although generally a court may not consider matters outside the pleadings in ruling on a motion to dismiss, the court may take judicial notice of matters of public record outside the pleadings. *Mack v. S. Bay Beer Distribs., Inc.,* 798 F.2d 1279, 1282 (9th Cir. 1986), overruled on other grounds by *Astoria Fed. Sav. & Loan Ass'n. v. Solimino,* 501 U.S. 104 (1991)*; see* Federal Rule of Evidence ("Rule") 201(b)(2) (stating that a court may take judicial notice of facts that are "not subject to reasonable dispute" and which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Where judicial notice is requested, and the court receives sufficient information, judicial notice is mandatory. Fed. R. Evid. 201(c).

CAWCD seeks judicial notice of its Exhibits 1-4 in its Motion for Judicial Notice. (Doc. 23.) Plaintiffs do not oppose the Court taking judicial notice of those exhibits for the purposes of ruling on CAWCD's and the Community's Motions to Dismiss, so long as the exhibits do not turn the motions into ones for summary judgment and are given their appropriate characterization. (*See* Doc. 40.) Therefore, after reviewing the exhibits, the Court grants CAWCD's Motion for Judicial Notice and will take judicial notice of Exhibits 1-4: (1) Amended Navajo Power Marketing Plan issued by the Department of Interior, Bureau of Reclamation, published in the Federal Register at 72 Fed. Reg. 54289 (Sept. 24, 2007) (the "Marketing Plan"); (2) Western Contract No. 11-DSR-12296, or, Reclamation Contract No. 1-CU-30-P121 (the "Western Contract"); (3) a November 30, 2017 press release of the Department of the Interior (the "DOI Press Release"); and (4) a letter dated June 1, 2008 from Timothy R. Petty, Ph.D., Assistant Secretary for Water and Science, United States Department of the Interior, to the Board of Directors and General Manager of the Central Arizona Project (the "Secretary's Letter"). (Doc. 23, Exs. 1-4.)

### B.   Motions to Dismiss

Defendant CAWCD and Intervenor-Defendant the Community (the "Defendants") make substantially the same arguments. Defendants argue that the Court must dismiss Plaintiffs' Complaint because (1) the Court lacks subject matter jurisdiction; (2) indispensable parties cannot be joined; and (3) it fails to state a claim for relief. (Doc. 22.) Because the Court finds that it lacks jurisdiction, as discussed below, the Court does not address whether indispensable parties are at issue or whether Plaintiffs fail to state a claim.

#### 1.   Lack of Standing

Before reaching the merits, the Court must first address Defendants' standing claim. *AOM Grp., LLC v. Provident Funding Assocs. L.P.*, No. CV-10-605-PHX-MHM, 2010 WL 3342020, at *1 (D. Ariz. Aug. 25, 2010) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)). Article III federal courts are limited to deciding "cases" and "controversies." U.S. Const. art. III, § 2; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). The Declaratory Judgment Act's "case of actual controversy" requirement and Article III's "case" or "controversy" requirement are the same. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). The plaintiff bears the burden of establishing the existence of a justiciable case or controversy, and "'must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

"Standing is a core component of the Article III case or controversy requirement." *Barnum Timber Co. v. EPA*, 633 F.3d 894, 897 (9th Cir. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish Article III standing: (1) a plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the

court"; and (3) "it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61; *see also Barnum Timber Co.*, 633 F.3d at 905.

Turning to Plaintiffs' Complaint, they allege that if CAWCD continues to make statements that it is not obligated to buy power from NGS or enters into power contracts with other suppliers, "CAWCD will make it more likely that NGS will close." (Doc. 1 ¶ 34.) They allege that though there are potential buyers, "they may lose interest and walk away in the near future if CAWCD continues to float its responsibility to purchase CAP's power requirements from NGS. Once the buyers walk, the demise of NGS will be assured. And its closure will wreak havoc [on Plaintiffs]." (Doc. 1 ¶ 34.) In other words, they argue that CAWCD is harming the sale process of NGS by announcing it is not obligated to buy power from NGS (and engaging in the process of searching for alternative power sources).

*Injury in Fact.* A plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Here, Plaintiffs have not stated an injury in fact. They argue their injury in fact is the harm to the ongoing sale of NGS. Specifically, they allege that they "suffer concrete injury from CAWCD's unlawful actions that directly harm the potential buyers of NGS." (Doc. 41 at 17.) However, Plaintiffs do not establish how they have a cognizable legal interest in an ongoing sale between potential buyers of NGS and NGS owners. They fail to raise the distinction between potential buyers having a concrete interest in enjoining CAWCD's alleged unlawful actions and theirs, which is one removed. Indeed, as Defendants argue, in the cases relied upon by Plaintiffs, standing was conferred on parties who were either buyers, sellers, or otherwise had some stake in the sale process itself. While the potential buyers in this case—third parties—would likely have standing, Plaintiffs do not account for their position as reapers of the benefits from the risks associated in the sale process felt by the potential buyers.

For example, in *Clinton v. City of New York*, 524 U.S. 417 (1998), the Supreme Court found that a farm cooperative had standing, at least in part, because it was engaged in ongoing negotiations with the owner of a processing plant and was actively searching for other processing facilities to purchase. Specifically, it held that the cooperative had been deprived of a "statutory bargaining chip," which inflicted "a sufficient likelihood of economic injury to establish standing under our precedents." *Id.* at 432. In *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993), the Supreme Court found an injury in fact where the party could not "compete on an equal footing in the bidding process…." In *CAWCD v. EPA*, 990 F.2d 1531, 1538 (9th Cir. 1993), the Ninth Circuit held that CAWCD had standing because, though its harm might have been indirect, it was obligated to reimburse the Government for a portion of NGS's compliance costs. In *Bryant v. Yellen*, 447 U.S. 352, 367-68 (1980), the Supreme Court found that landowners had standing, or a sufficient stake in the outcome of the controversy, because the owners wished to purchase the land at issue.

In sum, the cases Plaintiffs hang their injury in fact claim on show that courts have found Article III standing where an aggrieved party was either a buyer or seller, attempting to buy or sell, or somehow established a connection, *i.e.*, in privity, to the sale process so as to adequately allege a "concrete injury" under this theory. Plaintiffs do not share that critical factor. Plaintiffs do not allege that they are a buyer of NGS, they have any authority to sell or are participating in the sale negotiations, or have otherwise induced some stake in the sale process, other than, assuming a sale of NGS both happens and goes south, Plaintiffs will, admittedly, be detrimentally affected. The cases relied upon by Plaintiffs, however, do not support that the latter is a sufficient injury. Accordingly, Plaintiffs have not met their burden to show an injury in fact.

*Traceability*. To establish traceability, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. Plaintiffs argue that their injuries are

fairly traceable to CAWCD because CAWCD's conduct will likely make a sale of NGS less likely because a "potential buyers' interest will likely wane" due to its largest consumer taking its business elsewhere. (Doc. 41 at 20.) Therefore, it is more likely that NGS will not be sold, which would result in the Kayenta Mine closing, the Hopi Tribe losing money, and UMWA workers losing their jobs (among other hardships). (Doc. 41 at 20.) To support these claims, Plaintiffs cite to Middle River's letter to CAWCD, which states that, based on "public comments," Middle River envisioned that CAWCD would retain its existing ownership interest in NGS and would continue to utilize its share of the plant. (Doc. 1, Ex. D.) It also argues that, with CAWCD taking its business elsewhere, "it will be difficult for the interested buyer to find sufficient power consumers to replace CAP's power consumption" because CAP is its single, largest consumer of power. (Doc. 41 at 20.) In response, CAWCD argues that it is "illogical to suggest theoretical potential buyers" will care about CAWCD's power purchasing decisions. (Doc. 22 at 7.) Similarly, the Community argues that the NGS owners' decision to close NGS, despite its largest consumer still intact, renders speculative Plaintiffs' claims that future decisions of potential buyers about the feasibility of NGS operations will depend on CAWCD's purchasing NGS power. (Doc. 36 at 15.)

Simply following Plaintiffs' chain of causation evidences the speculative nature of traceability here. Plaintiffs are correct in that actions by third parties may not defeat causation on that basis alone; but, Plaintiffs acknowledge that "the links [may not be] hypothetical or tenuous." (Doc. 40 at 19, citing *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141-42 (9th Cir. 2013)). While the Court disagrees with Defendants to the extent they argue it is "illogical" or of little importance that CAWCD, the entity controlling NGS's largest consumer of power, will not be an important factor a potential buyer will likely consider, the Court does agree with Defendants that it is speculative to guess to what extent the potential buyer might consider that factor more substantial than another.

The Court finds that, here, the causation chain is simply too weak. Even accepting as true that (1) CAWCD's conduct will *likely* make a sale of NGS *less likely* (2) because a

potential buyer's interest will *likely* wane (3) due to NGS's largest consumer of power taking its business elsewhere, (4) which *would* result in NGS's closure (and then the Mine's), the Court cannot say that "[CAWCD's] action[s are] 'substantially likely' to cause [Plaintiffs'] injuries despite the presence of intermediary parties." *CAWCD*, 990 F.2d at 1538. Indeed, assuming as true that CAWCD will make a sale of NGS less likely, so to would the fact that no potential buyer could come forward, or that a potential buyer would not want to buy NGS because of pending, relevant legislation, or that the NGS owners will not agree to certain sales terms—the list goes on. Plaintiffs argue that they "do not need to plead or prove that NGS would be sold but for CAWCD's illegal actions." (Doc. 41 at 18.) Even so, however, they are required to show that it is "substantially likely" that CAWCD's actions are the cause of the harm to the ongoing sale process, which they cannot do.

CAWCD is not the only party who will or could have a detrimental impact on the sale process—the NGS owners and potential buyers (or lack thereof) are the parties who will determine what happens in the sale process. Though Plaintiffs attempt to confine their "harm" to that only CAWCD is inflicting on the sale process, that necessarily requires the assumption that potential buyers will consider their status as the providers of the largest consumer of power as the most influential or at least substantial factor in determining whether to pursue or consummate a sale. But, as evidenced by Plaintiffs, Middle River knew that CAWCD had stated its intent to and was indeed looking for other power sources and, yet, it decided to press on in the negotiations nonetheless.

While the Court accepts as true that a potential buyer will be more inclined to want to buy NGS with its largest consumer intact, so to could a buyer be more inclined to want to buy if state legislatures do not pass environmental laws that could negatively affect NGS's viability. In other words, who is to say that having NGS's largest consumer "intact," so as to make it more economical to run than if not, is a more significant or the motivating factor in a potential buyer's decision to buy? Even if it were, that does not account for the NGS owners' decisions about what offer they might be willing to accept from a buyer. In other words, while it is not speculative to conclude that a potential buyer is more likely to

buy a power plant with its largest customer intact, it is speculative to conclude that that factor is what is substantially causing the harm to Plaintiffs. The argument that "if the potential buyers walk away, NGS and Kayenta would close at the end of 2019 absent unforeseen developments" demonstrates the issue. (Doc. 1 ¶ 36.) One, if a potential buyer walks away, there is no way to trace the harm, or, rather, why that buyer walked away, to CAWCD's alleged illegal actions. Second, as Plaintiffs agree, NGS is already destined to close in 2019. The Court simply cannot say, with any degree of certainty, that CAWCD's alleged illegal actions, as opposed to third parties, would be the significant factor in causing a potential buyer to walk away from a deal or otherwise "harm" the ongoing sale process. Therefore, Plaintiffs have not met their burden on traceability.

*Redressability.* Redressability requires that "it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. Plaintiffs do not need to demonstrate that their injuries *will* be redressed, but they do need to show a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered in order to establish Article III standing. *Novak v. United States*, 795 F.3d 1012, 1019-20 (9th Cir. 2015) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989)). "There is no standing if, following a favorable decision, whether the injury would be redressed would still depend on 'the unfettered choices made by independent actors not before the courts.'" *Id.* at 1020.

Here, Plaintiffs' injuries are not likely to be redressed by a favorable decision because a declaration that CAWCD must continue buying power from NGS, and a court's order to that effect, will not make it likely that the harm to the ongoing sale process would be eliminated. Indeed, even if CAWCD were to continue buying power from NGS so long as it was open, the sale process could be "harmed" by either the NGS owners or the potential buyers. This is also assuming that any potential buyer would consider CAWCD's purchasing power to be more of an influence in their decision about whether to pursue and consummate a sale than another factor. While Plaintiffs argue that the sale process would no longer be hindered by CAWCD's alleged unlawful conduct, as already analyzed, there

is no way to discern how much "harm" CAWCD would inflict due to their alleged unlawful actions as opposed to third parties' independent decisions. In sum, the Court finds that it is not likely that an order from this Court would reduce the probability of the injuries. Thus, Plaintiffs do not meet their burden on redressability.

### IV. Conclusion

For the reasons stated above CAWCD's and the Community's Motions to Dismiss are granted. Accordingly, Plaintiffs' Complaint is dismissed for want of subject matter jurisdiction. However, Plaintiffs are given leave to amend solely to address standing.

Accordingly,

**IT IS ORDERED:**

1. That Defendant Central Arizona Water Conservation District's Motion to Dismiss (Doc. 22) is **granted**;
2. That Defendant Central Arizona Water Conservation District's Motion for Judicial Notice (Doc. 23) is **granted**; and
3. That Intervenor-Defendant Gila River Indian Community's Motion to Dismiss (Doc. 36) is **granted**.

**IT IS FURTHER ORDERED**:

4. That Plaintiffs' Complaint is **dismissed**;
5. That Plaintiffs have until **April 19, 2019** to file an amended complaint; and
6. That Defendants have **three weeks** from the date Plaintiffs file an amended complaint to file respective motions to dismiss.

Dated this 31st day of March, 2019.

Honorable Steven P. Logan
United States District Judge